May it please the court, my name is Omodari Jupiter. I am representing the appellant Elvin Wrensford and we are going to argue the issue of the district court's denial in error of the suppression motion that we brought with regard to the lack of probable cause to arrest. Attorney Webster is going to argue the issue with regard to the lack of unanimity in the jury verdict. The district court admitted evidence in error that the Virgin Islands Police Department obtained as a result of an arrest that was not supported by probable cause. The district court ruled contrary to Supreme Court precedent for over 37 years that the police can involuntarily transport someone to the police station and even in this instance to a jail cell without probable cause to arrest. Mr. Jupiter, I just want to fix our time frame. So you are, the period of when it becomes an arrest from your point of view is from the time he's transported to the location to headquarters, am I right? As opposed to the event that preceded it. Yeah, my position is when he's transported that that's the bright line rule. But I think the court can even take, obviously in this case, the court can take the station house door as the threshold. Because I think the Supreme Court has been very clear in its precedent that it wants to provide a clear guide to law enforcement. They don't want law enforcement making these balancing tests, balancing decisions when you have something tantamount to an arrest. So supposing that the police have reasonable suspicion to believe that the person they are looking at in the street may have been involved, excuse me, in a homicide, have reasonable suspicion, which may not play out, but it may. And so now they make a decision, look, we know there may be witnesses to a homicide, so let's take this person over to the station house. Why would you hold him in the street in handcuffs? Let's hold him in the station house. Maybe we can ID him. Maybe he can be exonerated. Maybe he can be charged. What's wrong with those steps, which appear to be what happened here, as opposed to your bright line rule, which says you take him to the station house, that's an arrest? Well, Your Honor, because once again, it's bad for a number of reasons. Number one, it violates Dunaway v. New York, Mississippi v. Davis v. Mississippi. All right, so what you're saying is they either arrest him there or they let him go? Well, Your Honor, they can't arrest him if they don't have probable cause. That's the problem, and that's what the Supreme Court wants to protect. The Supreme Court made it clear. If this is an arrest, there's no balancing test. You don't go into the Terry considerations. Terry refers to street encounters. Initially, it referred to a patting down frisk. Then there were certain things that happened in street encounters that came up later that the circuits have pretty much all agreed on. Yeah, you can put handcuffs on. Yes, you can maybe take him 40 feet away or a couple of feet away to do, or maybe down the block for an identification. Maybe you can do that. Maybe you can put him in a police car, certainly. All of these things are happening on the street, and after 40 years, after Dunaway v. New York, after more than, I'm sorry, after 37 years after Dunaway v. New York, and before that Mississippi v. Davis, and even after the Sharpe decision, the court relied heavily on Sharpe and this circuit's opinion in Johnson that referred to, once again, street encounters of what was going on in the street and referred specifically to the brevity or the duration of the stop. Well, let's talk about the location where the stop happened, the time of day, what the information the officer who was responding had at the time. Okay. Okay. The Supreme Court and Royer say there are undoubtedly reasons of safety and security that might justify moving a suspect from one location to another during an investigatory detention. Why isn't this that sort of circumstance? Okay. And I think, number one, I think that that was Dicta and Royer. Let's say it's not Dicta, though. What was going on in Royer? You're in an airport, and the police have a room that's 40 feet away. They're in public, they're on a concourse, and they say, this room, we have this room that's 40 feet away, and what's the purpose? They want to go through this man's luggage. That's what they want to do. They say they go 40 feet away. The Supreme Court said that's not okay. They needed probable cause then. But they said, you know, there might be some instances, and based on the facts in Royer, where you can say, you know, maybe you can take somebody 40 feet away. But you're saying probable cause, but you can detain somebody on reasonable suspicion. Yes. Yes. No question about that. So you can handcuff somebody because of reasonable suspicion. No question. No question. So what is your argument then, that they went beyond those points, taking him to the station house, and that's an arrest? No question about it, and there's not one case after all of this time. In other words, I'm trying to see where you draw the line. Yes. I think you draw the line. I think you clearly, definitely draw the line at the station house door, Your Honor. Okay? But I would even extend it to when, once the police make the decision that we're transporting you to there. But I don't think that's necessary in this case. I don't think that's necessary, because they took him to a jail cell. I mean, reasonable suspicion, I think, you know, it doesn't coincide very well with line drawing, because reasonable suspicion can continue. And you're saying at the door, meaning when you bring him into the station house, that's an arrest. Right. How about if there's a police car on the street, and they cuff him, and then they put him in a police car? That's kind of confined detainment. Why isn't, would that be an arrest? Because of what, it could be arrest. Now, there's plenty of cases that say, just by, you know, it's clear, you can handcuff someone during the terrorist act. Understand. That's where some balancing can take place. My last question, my last question is, if he is detained and goes to the station house for identification, because they want to make sure they've got the right suspect, or if he's not the right suspect, he should be released from custody. You're saying that can only occur if he is arrested. Your Honor, what I'm saying is, the first determination the court needs to make is whether or not it is indistinguishable for an arrest. Once you make that determination, you don't go into the Terry balancing factors. You don't go into them. Once they say that, you've got to have probable cause. The Supreme Court's been very clear on that. With this. Well, here's the question. Go ahead. So, here's the question I have. I'm curious as to your line drawing. You've said a couple of times that it's at the door or the steps to the police station. Why isn't it once you go into the cruiser or the police car? I understand that there are times when, for safety purposes, you can put someone in the police car, you know, people are hot and bothered, you know, there are obviously safety considerations, etc. But, presumably, a lot could happen between the time one is put into a cruiser and the time that one arrives at the station house. I presume that you're not saying that that period of time, from the time one is in the cruiser until the time one is in the station, is not a de facto arrest. Okay. Let me make sure you're saying, I'm not, I'm not saying that the time from... The de facto arrest begins when? So, Your Honor, I think... To the courthouse or does it begin when they are, in fact, arrested and disregarded? Right, right, right. Your Honor, I, if I were making the rule, I would say once the police have made a decision to take you to the police station for interrogation purposes, that that would be an arrest. Now, so, but the act of putting someone in, if you can put someone in a cruiser for many different reasons, and that's where it can get, it can, but in this case, we don't have to worry about that. If it's not for interrogation purposes. So, yeah, if you put someone in a police cruiser for, that's not for interrogation purposes. But if it's for identification purposes. That's, there are cases that say that that can be, then that's when you do what? That's a street encounter where you do have to balance, that you would, that's still akin to a Terry Street encounter. But when every case, every circuit... But that's this case, isn't it? They were... They were taking this individual to the station house for identification purposes. Well, they were taking him to the, it's not really, it's not really clear that they were very clear about why they were taking him to, but they say it, they say it in the finding. Right. The finding was, was that it would take, that Cruz said, I expected him to be taken there for this other officer, Mendez, to go and identify him. And for, and for the case agent, Detective, Detective Matthews, to go and question him. He would ask, Matthews would go and question him. And so we go back to Davis versus Mississippi where they engage in this analysis of whether, Davis versus Mississippi and Florida versus Hayes, where they engage in this analysis of, well, what if we carve out an exception for fingerprinting? And they said emphatically, no, we're not going to. And plus, in believing Davis, they said, that's not even a problem here. It may have been Hayes. That's not even, that's not even a problem here because he was also taken, the defendant in that case was also taken for interrogation purposes, like Rensselaer was taken for interrogation purposes. Let's assume we were to accept your position that there was a de facto arrest at the time he was transported, brought to the station. And let's assume for the purposes of this question that the young woman, Tanisha's identification occurs. Thereafter, he's asked to provide a DNA sample. Do you think there's a benefit to asking the district court on remand to determine whether there are intervening events that broke the chain or the connection between what you're referring to as the de facto arrest and the DNA sample? I think this court has enough information to make a determination that there is no attenuation because there was continuous custody, and he was continuously in police custody. There was, so the question is... But isn't there more, there's a case that is escaping me right now, but there's a case that talks about, I think it's now, K-A-U-F-F, I think. But it basically, it talks about the fact that whether the record before the court is sufficient for it to determine whether there is a break in the intervening event. And I think that, K-A-U-P-P. And I believe they said there was, you know, if on remand there's something that's not before the, in this case, the Supreme Court, to determine if there's been a break, we're going to send it back on remand for the court to see if there's anything there. Fact finder. What do you think about that circumstance applying in this case? Well, I think, first of all, there's certainly no break in terms of the identifications, and the identifications were used. Right, I want to move past the identifications. Yeah, so past the identifications and past the statement, and then say if it's only DNA, whether or not there was a break. I still think the court has a sufficient record here, and I think that was also, the district court, I guess the district court did not make a finding with regard to attenuation there one way or the other. So, but I do think there's sufficient evidence in this record that would show clearly that there was no attenuation. Thank you. You know, I'm sorry, did you say at the beginning what you wanted from rebuttal? I did not, Your Honor. Okay, what would you like? Two minutes? Thank you, Your Honor, I appreciate that. Yeah, no worries. Yes. Good morning, Your Honors. Marshall Webster on behalf of the appellant, Craig Muller. I would like to join in the arguments of my co-counsel. And that's an interesting choice of words that I think we'd like to talk to you about. You'd like to join, so what are we to make of this notion of Mr. Muller joining Mr. Rendsford's arguments when the underlying facts are obviously disparate? Are you making the argument that anything that arises from the encounter with Mr. Rendsford should have a poisonous tree analysis despite what the government may say about inevitability or independent discovery? There were no independent discovery, in fact. The evidence in this case established that the only witness to make an identification, and not a court identification, but identification of Mr. Muller was that witness had given a statement the night of the incident and did not identify. In fact, her three statements, which were all inconsistent with respect to the identification of the driver. And Mr. Muller has been charged with aiding and abetting Mr. Rendsford and identified as the driver. However, her statement was taken by a detective who never testified at the trial. But none of that was presented in the briefs to us. Your adversary didn't argue about that point because it didn't implicate his client. And I think that what Judge Greenaway was driving at is when you join an argument of a co-defendant, but the facts are not either elucidated in that brief or the legal standard isn't set forth. How is it that you could preserve the argument to challenge basically Tanisha Teague's identification from the six-person photo array? Right. Which is totally different than the identification challenge. Of course. So I guess our concern is how could you have preserved your argument on identification under these circumstances? Well, the facts are in the brief for sure. And if you the brief states that Tanisha's statement, which was introduced into evidence, was, again, days, that statement that was introduced was taken days after the arrest of Muller. I introduced in the brief as well the newspaper clipping the day after the incident that identified Mr. Rensford by name in the newspaper, and that subsequent to that publication, Tanisha Teague identified Muller as someone she had seen before with Mr. Rensford. So she was not able to identify Mr. Muller in the incident of Mr. Rensford. And that's the point I'm making. But my argument really... But how does that work with the notion of the fruit of the poisonous tree? That's what we want to understand. Well, I didn't join it as the fruit of the poisonous tree. I just wanted to make sure that the court... But if you didn't join that, right, then how do we get here? Because I presume that, you know, in looking at his arguments, the only thing that you could possibly join that would be applicable to your client is this notion of the fruit of the poisonous tree. And, again, I think what Judge Swartz and I are trying to get at is that would work if you were focused on the same operative set of facts. But since the facts as it relates to each of your clients is disparate in both time and with regard to what actually happened, how can you rely on this poisonous tree argument that was put forth by Mr. Rensford? Let me say what I did. I argued that point in my argument with respect to the sufficiency of the evidence to convict Mr. Muller. I didn't join it as a fruit of poisonous tree argument. But you asked me, so I was trying to see if I could argue that point. But my main point here is my five minutes that was allotted to me was to argue about the polling of the jury. And we believe here the court made an error. And when, well, Mr. — after the — we asked, of course, the defense after the jury to be polled. In one instance, we believe, well, the jurors being polled with respect to Mr. Rensford, we had a number of sidebars and I think we brought it up in our arguments. But specifically, with respect to Mr. Muller, count one, no. Remember, juror — Mr. Rensford was charged with five counts. There were 12 jurors. And they were all polled with respect to Mr. Rensford. And they all answered affirmatively. I believe that was their verdict. With respect to Mr. — so the jurors at least heard the question asked with respect to Mr. Rensford. And they heard the answers of the other jurors about 60 times, I would say, the jurors had to answer. Twelve jurors, five counts. But when it came to count one for Mr. Muller, juror number seven unequivocally said no, that was not her verdict, even though she had signed the jury form. Is that her exact phrase, no, that is not my verdict? No. But she was asked twice. And she said no twice. She said no. Twice. One-word response. She was asked, was that your independent verdict with respect to count one for defendant Muller? She said no. Then she was asked again to make sure that her answer was clear. And she said no again. So there was no question about that. The judge continued to poll the jury with respect to that particular count. At the end of polling for that particular count, that was count one, the judge called counsel to say bar. And at the time, the judge asked the counsel what is their desire. At that time, I was counsel for, of course, for Muller. I wasn't sure what I should do at that particular time. But ultimately my thinking is because I've been in that situation where jurors just answer in a way that's totally different from all the rest of the jurors. But that doesn't decide the case, does it? I mean, there is such a thing as telling jurors to go back, to continue your deliberations, to reexamine your views, to consider and respect each other's views, et cetera, et cetera, et cetera. Isn't it what the judge did in this case? Or is it just because she said no on that singular occasion that that, therefore, is an error on the part of the trial judge? At that point, everyone knew how the jury stood numerically. One juror who signed the verdict form is saying in court, among the other jurors, this is not my verdict, not once but twice. Can jurors change your minds? Yes, but it's not supposed to change the mind through coercion by the court or by other jurors. It should be the independent verdict of the juror. What was the coercive act of the court? Well, I think the calling of the safe bar and singling out that jury. And when you instruct, when you have 11, we know that she was the only juror or he or number seven was the only juror that said no. I believe that when you call the safe bar, you stay at safe bar for a substantial time discussing the matter. And then you, and I objected to re-instructing the jury. And the jury then is re-instructed. And you basically, our position was that judge instructing that juror, instructing the jury again is basically talking to the one juror. Well, just help us. What's, if there was no sidebar, you'd object to that. So it can't be that you had a sidebar. It can't be that's the basis. But we didn't call it a sidebar. I'm so sorry? We didn't ask for a sidebar at that point. Well, the judge was looking to make sure that she had a good counsel in front of her explaining what should we do under these circumstances. And the juror wasn't summoned to join you at sidebar. It was just counsel, correct? Correct. Is there anything wrong with the substance of the instruction? And if so, tell me how it's inconsistent with Third Circuit law. Well, I would think that the we already know how the jury stands numerically. She already indicated in open court before everyone that was not her verdict, even though she signed the verdict form. So my question is how can you instruct the jury again when she already clearly indicated that was not her verdict? All you're doing at this point, Your Honor, is ---- But, Mr. Webster, it's permissible under Third Circuit law. That's the judge followed what the law, you know, our law is. So in the absence of something specific on your behalf, I think we're probably good. You're saying that it's okay for the judge to coerce the jury to reach a verdict of guilty. No, what I'm saying is what is it about what the judge said that is inconsistent with the law of the Third Circuit? That's what I'm saying. So what is your specific response to that, please? I think the ---- after the jury already ---- I think the judge will declare a mistrial, at least with respect to that particular count, because the juror already ---- What the only logical, excuse me, a juror to do in that situation is to do what the judge is basically telling her to do, join the other jurors. And that's exactly what she did. All right. She had no choice. Well, okay. Thank you very much. Thank you. We'll hear from your adversary. Thank you. Good morning, Your Honors. David White for the United States, along with Ms. Rhonda Hanbury Williams. I shall be arguing with respect to Mr. Rinsford. And I'm splitting my time with Ms. Williams-Henry, who will be arguing with respect to Mr. Mueller. Your Honors, Mr. Jupiter stated with respect to Rinsford that he believed that bright line was the proper thing to have here and that the law indeed has benefited and observes these bright line rules with respect to arrests. Most simply put, the United States fundamentally disagrees with that and does not believe that bright lines govern the law with respect to arrests and tarry stops. Can you find all of your adversary marshaled together a list of cases during his brief and in his remarks to us that all seem to suggest that transportation to a police station without probable cause is a de facto arrest. Can you identify either facts that should allow us to distinguish those cases or give us a case that says that transportation is appropriate? Well, Your Honor, first of all, there's Mullins from this court in which a defendant was transported to a police station and he'd waited for 55 minutes for a drug detecting dog to sniff his bag. But that was a non-presidential opinion. That's correct, Your Honor. It was non-presidential. There's also Sharpe. You don't want us to follow a non-presidential opinion. You don't. Well, Your Honor, of course, you're certainly not bound to follow it, but it also does represent the reasoned judgment of this court and the United States thinks that it makes sense. There's also McCoggle from the Second Circuit and that was a published decision. It is from the Second Circuit and it stated, yes, transportation to a station house does not necessarily result in a de facto arrest. Do you remember? Go ahead. We've been asking the same questions over and over. Go ahead. What is the key about that case that you've just cited from the Second Circuit that compels us to be inconsistent with Supreme Court precedent? Well, I don't think that there's anything that would compel you to be inconsistent with it, but I was going to say, Your Honor, in Sharpe, the Supreme Court, you know, specifically eschewed adoption of bright line rules and time limitations with respect to arrests and indeed how arrests and how a stock transforms into a de facto arrest that the court was very clear about. You're not asking us to blur the line between a situation akin to our ruling in Johnson and the de facto arrest jurisprudence of the Supreme Court, are you? No, not at all, Your Honor. I'm simply stating that bright line rule, the government does not believe that this field of the law- Let's take that out of our lexicon for today's purposes. There won't be bright lines, but if you're not asking us to blur the lines that I've just suggested, then what is it that you're asking us to do? Are you asking us to look at this and say, this is not a blurring of those lines, this is more akin to Johnson, so apply Johnson? Or are you just saying, you know, it is a de facto arrest, but it's a circumstance in which you can essentially create an exception to what appears to be, at least based on Supreme Court precedent, a fairly set precedent? I believe that it would be more akin to the former, Your Honor, and that this is more of a Johnson case. I mean, what we have here is a fact, what we know from the facts and the record are that when Officer Cruz encountered Mr. Rinsford, it was late at night, the two of them were alone on a road, Mr. Rinsford was on the side of the road, he could extend his hand to touch the bush, there were no other pedestrians around, and Mr. Officer Cruz asked Mr. Rinsford, you know, to place your hands on the car. I think that Officer Rinsford acted very brutally in stating, in concluding, this is a type of investigation where I want to determine perhaps identification for you, learn more about you, this would be much safer and easier to perform in the station house, rather than here at night alone on the side of the road, particularly when Officer Cruz knew that there was another suspect. If that were so, there is no police officer in the United States who would not do that, right? If that's how we ruled. Because everybody's going to say, it's got to be safer if I handcuff someone and take them to the station. Well, I think, Your Honor, here are the facts, there are, I mean, I'm not, I do not agree that that would be a blanket answer that would apply to every officer in every circumstance. But I believe here what you have to do is look at the totality of the circumstances and judge each case based on its facts. It sounds like what you're saying is an evening encounter between an individual and a police officer, which could be interpreted as being potentially fraught with danger, should be met by caution, and that caution would be, let's handcuff the person, take them to the station, and under those circumstances, have whatever encounter needs to be had. Well, I think that those facts are all true, Your Honor, but there's also more that Officer Cruz knew than just the facts that I said. I mean, he also knew that this particular individual was caught, you know, roughly 40 minutes and roughly a mile and a half from the crime scene. He was in the area of the crime scene that suspects were known to head. He also had a physical description of that time, and I believe the exact quote is, two slim, black Rasta males. This individual at least fit one of them. I can't imagine how many people could fit that description in that area. Anybody with dreads would be a Rasta male under that circumstance. Well, I don't know numerically, Your Honor. I wouldn't know, but given everything that that officer did know at that time and in that location, I don't think that what he did was unreasonable, particularly in moving it to the police station. But the facts here, at least I didn't see anything in the record to say that the motivation of the officer to leave the location was safety. It was to allow, to confirm, as your adversary was talking about, Officer Mendez to say whether or not this is the same person he saw take off, and to allow the case agent to inquire of him. So even if there were some safety consideration or exception to the transportation rule that seems to be pronounced by the Supreme Court, the evidence here doesn't, I didn't see anything in the record that said that was the reason the officers acted. And if I missed something, please correct me. Your Honor, I believe that he, and I may be wrong, but I actually believe that Officer Cruz did state that he was scared at that time. He did have fear because he knew that there had been a shooting and two people were at large. So I believe that his testimony, and Your Honor, I want to say it's around page 550 to 575 of the appendix, actually did state that. That aside, Your Honor, I also believe, I mean, he also did want to ensure, you know, he wanted to act very diligently to dispel perhaps an identity problem. Have someone else, specifically Mendez, who encountered, you know, possibly encountered this gentleman earlier, look at him and have Officer Matthews, who is the case agent, speak with this individual. Wouldn't he have accomplished that by having those gentlemen come to the location rather than transporting Mr. Rensfer to the police station? Your Honor, that may have been, but again, one alternative, even if it's actually better, doesn't mean what the officer did here was wrong or somehow violated the Fourth Amendment. So you're relying on the Second Circuit case in McGaugle to support your position that the transportation here was not a de facto arrest? I think that, Your Honor, yes. I think that that case is support for the fact that one can be transported to a police station and that does not necessarily render a de facto arrest. I'm sorry, go ahead. I'll go up. Yeah, yeah, yeah, I can tell you that. I sensed it. Describe the exact encounter in McGaugle. Your Honor, in that one, I believe that the defendant had been encountered by law enforcement officers. I think that he was arrested on drug charges, I believe, and the officers had information that McGaugle was in a particular case. They went there. They found him. I want to say it was in a bar, maybe. But that encounter arose because they were looking for him. It was not a chance encounter. I'm just going by your description. Your Honor, I'm sorry, and I actually don't know. I mean, I thought that they were looking. I thought that they did have information that it might have been him, and that may be wrong. I thought that they encountered him in a bar, and it may have been based on information that he was there, or it was a bar that they knew him to frequent that maybe he wasn't. So that in and of itself makes it distinguishable. Well, I think to a degree, but again. If not going to the station, Mr. White, there's got to be a point where this turns into an arrest. Your Honor, that is true, and again. But, White, why isn't it when he is not just handcuffed and taken to the station, as your adversary says, but he's put in a cell? Well, because, again, that is still permissible to do for purposes of. . . You can do that, and even Terry recognized the belief that you can do that while you're ascertaining why there's an ongoing. . . I mean, that was a brief encounter. Here you're talking about something that took over an hour, if I'm not mistaken. Yes, that's correct, Your Honor. It was roughly an hour. And at some point, why doesn't that turn into an arrest? Well, at some point it would, but again, the police were acting very diligently, and I don't think that while they were waiting to have an identification. . . So the focus then is not the timeline involved. The focus is what the police were doing. I think it focuses on the diligence of law enforcement so they can either confirm or deny their suspicions while the investigation is ongoing. And they did have to wait to have the confirmation or, excuse me, the identification by the Teagues of Mr. Rinsford. So that's the point in time where it becomes an arrest as far as the Teagues have the opportunity to identify? Well, I think that the identification, yes, that's one factor to be considered. But I don't think that there is a discrete point in time when, okay, that means . . . No, I'm asking you, in this case, when is the . . . there's got to be eight. We're dealing with one set of facts, right? I mean, you know what the continuum is. When is the point in time when it became an arrest? Well, once the law enforcement officers had gotten the Teagues to identify him, then he . . . you know, they still wanted to find out. They want to have him look because the Teagues had seen him when he was on the street corner being transported because the police officers were trying to keep them separate. So, you know, that was at 10 o'clock when the Teagues signed their statement stating that Mr. Rinsford was the gentleman that they saw during the shooting. But that's when probable cause came to exist, am I right? Well, that's when the police did have probable cause. That's correct, Your Honor. I had asked your adversary about if we were to conclude that there was a de facto arrest, what should we do? Should we then determine whether the identification of Ms. Teague should be suppressed and the DNA? Or should we have the district court decide, at least with respect to the DNA, whether there's been a break in the sequence of events? I think that the court does not need to remand that. I think that the court can state, look, given the fact that he was identified . . . it was not overly suggestive in light of the other evidence of guilt and the fact that he was given his Miranda rights, he did speak to the police officers, that the court can say there was not some type of break such that everything is bad now. You think there was no break or there was a break between a de facto arrest and . . . I'm sorry, Your Honor. I just want to read the language from the case so that we're talking about the same thing. Because my question is, are you relying on this record to make your argument that we could decide whether there was an intervening event? The case, the language is, whether there were intervening events that broke the connection between the illegal arrest, on the one hand, and the evidence procured on the other. Is there enough in this record that we should make that decision or should we do what the Supreme Court did in Kaus and let the district court take a look at the record and see if there's anything there to see if there's been a break? Or is it your position there was a break and then maybe you can identify what the breaks are? I recognize that wasn't argued to the district court because you had a conclusion from the district court that there was no improper arrest. Your Honor, I'm thinking a lot right now based on your question, but I would think that the record would be sufficient such that the court can conclude that even if there were a de facto arrest, that that would not render any subsequent events to have violated Mr. Rinsford's Fourth Amendment right. What intervening events broke the connection between the arrest and the securing of the evidence? I'm sorry, what? What intervening events would we look to then that's in this record to show there's been a break between the arrest and the collection of this other evidence? We have Ms. Teague's identification, we have Mr. Rinsford's statement, and we have the DNA. Well, those are the three things. I mean, you would have the fact that the Teagues did identify Mr. Rinsford. You would have the fact that Rinsford was provided, he was given, he was apprised of his marina rights. He chose to answer questions. I mean, that would be, I think, a very material consideration, the fact that he understood his rights and he continued to answer questions. And you do have the DNA evidence. Which was not provided by consent? He actually did consent to that, Your Honor. He did? He did. Yeah, Mr. Rinsford did consent to the collection. So basically the break in the intervening events are the fact that probable cause came to exist, and then he was Mirandized, made statements, and then consented to the DNA. Those are the three pockets of intervening events. I think those are the three largest material considerations. Yes, Your Honor, that would be correct. Now, the other issue that the defense brought up was one of the pulling of the jurors. Don't worry, you're not going to leave. You don't have to spend a moment on that. I want to come back to what we just talked about. So that would mean that in any case where there was a potential problem with arrest, that almost anything that happened subsequently that complied with Fourth Amendment law would be an intervening event, right? Because, all right, so we have a de facto. Look, we're assuming for the moment that we have a de facto arrest. So what is your understanding of what an intervening event would be based on what the judge just read to you? Your Honor, I really don't know. Without that being something that I have researched and looked at, I would be somewhat hesitant to state, but I can see how I think that reading Miranda rights would be a very important consideration to make sure that the defendant received his proper Miranda rights. Whether those rights were waived, I can see how the fact that an investigation may be ongoing and to the extent the police are diligently trying to find out more or gather more information to see if other witnesses were present that maybe could confirm what some witnesses may have already identified the defendant as being. They might dispute that. I think that there are a number of considerations that would go into the intervening calculus. Thank you. Your Honor, I believe that the court wanted me to address something with respect to the polling issue regarding Mr. Rinsford. Thank you, Your Honor. Yes, thank you. I'm not quite sure we need anything on that, but please take the stand. I mean, take the podium. Good morning, Your Honor. May it please the Court. Rhonda William Tenney on behalf of the United States. Good morning. Your Honor, the trial judge did not abuse her discretion when she denied the defendant's motions for mistrial in this case. The facts are that with respect to defendant Mueller, when it came to polling on count one, the juror number seven said it was not her independent verdict and there was a sidebar immediately after. At that point, defendant Mueller moved for a mistrial, and the government argued that then that mistrial, if the court was to grant the mistrial, should be for count one only and not for the other counts because they would stand. At that point, the defendant asked for the polling to continue, and after the polling continued and all the jurors were unanimous in their verdict, that's when defendant Mueller moved for a mistrial on all counts, and the government argued that, well, the jury should go back. But what was the verdict on all those other counts? Was the jury unanimous? Yes, as far as Mr. Mueller, yes, it was unanimous. It was only as to one count involving Mr. Mueller that there was equivocation or there was a clear statement by the juror, no, my verdict is not guilty. There was no equivocation, Your Honor. She did say that it was not her independent verdict. She applied no. The government asked that the jurors go back to deliberate since it was only as to that count on count one that the verdict was not unanimous, and the court denied the defendant's motion, and in chambers the court read the proposed instruction, which was the modified Third Circuit instruction. The defendants did not object to the proposed instruction, and it was read to the jurors, and they came back and said that it was their independent verdict on count one. For this court to find that the judge abused her discretion, she would have to have her denial of the motion would have to have been arbitrary, fanciful, and clearly unreasonable. And this court has said that the trial judge is in the best position to view the particular circumstances of a case and to determine if a juror is coerced with respect to its coerced in order to come to an agreement with the majority, and there was no coercion in this case, Your Honor. So we would ask that the court affirm the judgment from the district court. Thank you so much. Very briefly, Your Honor. I did have one question for you. Yes, Your Honor. In the analysis, because, you know, this is a fluid situation, and I'm wondering, you know, if we were to write an opinion, what it would look like. Does it matter that this is a street shooting involving a homicide versus, for example, somebody that's taken into custody in the same circumstances involving a simple assault or a shoplifting or something like that? Well, at the time that they were investigating. In other words, does the nature of the offense and the gravity of it have a role in whether there is an arrest or a brief terrorist attack? Not at all, Your Honor. Probable cause is determined by the information that the police officers had that a crime was committed and that the person that they have in custody committed the crime. So the gravity of the offense has no place. And I would remind the court that at that time it wasn't a homicide. It wasn't an assault. It was a shooting. But nevertheless, that does not have any bearing on it. Your Honor, can you comment, if you would, with the scenario that we posed here, adversary, in which you assume for a moment that we rule that there's a de facto arrest. And I hope you were paying attention to the exact wording of the quote that Judge Schwartz read. Are there intervening events that would offset the finding of the de facto arrest? Not in this case. Certainly Miranda warnings, I believe there is a case where they talked about Miranda warnings, but it's in the context of someone having And also having, I think, having a decrease, the attenuation goes to the taint of the illegality. So in this case, this is an illegal detention that continues. So the question is whether or not the police or some other intervening events intervene to where they decrease, take away that taint. Mr. Rensford's level of custody continued throughout. I mean, he was in one police station to another. They certainly, the identifications are not something that's going to break that level of, the taint of that or illegal arrest. Does it change from being an illegal arrest to arrest supported by probable cause once that identification is made? No, because it was made by the illegality. I see what you're saying. It only happened because he was in a state. So put aside the identification for a moment and move on to the DNA. And so once again, the consent, whether or not you have consent, consent that is obtained while someone is illegally in custody, whether or not that consent was not tainted by the original illegality. So your position is that the only reason why the DNA could be secure was because he was originally brought in, and only because he brought in did we have this chance encounter of the identification. And the only way he can, the only way they got a Miranda waiver as well as consent to give DNA, those things were only obtained because he was there and it was more likely, I think it's pretty clear, people are more likely to give consent under the circumstances. But in other cases, though, where you have, there's one that comes to mind where the break in the chain, I believe, was because the defendant had a chance to talk to family members. Okay. This case may sound familiar to you. Right. So there was a point in time where there wasn't a legal arrest, and then there was this encounter with family members, and I think the court then found that broke the chain. Right, and I think those types of events give someone more a sense of it's more like I'm not in this jail. Okay. Mr. Rensford is literally in jail. And, as a matter of fact, Mr. Rensford specifically said, I know I'm getting arrested. The guiding principle you seem to provide is once the police take someone into custody and into the station house, that's an arrest. Yes, Your Honor. But, you know, these firm rules, we always run into problems with them. Because the station house could be two blocks away. The station house can be on another island away. And so you may have, you may be talking about 15 minutes, or you may be talking about two hours. Yes. So how do you square that? I think you look at the five cases on there, and you look at all of the circuits, you look at all the circuits that I. . . Always the station house. Every one, every station house one. And I think that's the reason why you don't have a whole bunch of cases, because it's pretty clear. You can't take them to jail. You're taking them to jail. Let me ask a follow-up on Judge Schwartz's question. So, I'm sorry we were distracted for a moment. Is the remedy, then, that you're seeking, once we deem this to be a de facto arrest, that's it? It doesn't go back to the. . . It need not go back to the district court. It need not. Certainly the court, I think what Judge Schwartz said with regard to. . . I can't say that this court can't do that. I think the court has sufficient facts to find. . . I think the government would have had the burden of proving that once you have this illegal taint, that any consent or any consent that was obtained while he's still in. . . while that was started by him being illegally arrested, that the taint's not there. And certainly there's no facts that we can point to here that erases the original taint. So I think the court is on all fours. And by just saying, by just reversing, finding the court was in error, the district court was in error and remanding for a new trial. And I take it then your view is because of the nature of the evidence that was secured during this period of what you consider to be a continuous illegal detention, it could not be harmless, because we're talking about the DNA and the identification. So from your point of view, it could not be harmless. Unquestionably. Thank you, Your Honor. Thank you.